UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JANICE MCCALL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:08-cv-2000-M |
| | § | |
| SOUTHWEST AIRLINES CO. and | § | |
| SOUTHWEST AIRLINES PILOTS' ASSN., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Southwest Airlines Pilots' Association's Motions to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [Docket Entry #22]. For the reasons explained below, the Motion to Dismiss for lack of subject matter jurisdiction is **DENIED**, and the Motion to Dismiss for failure to state a claim is **GRANTED** in part and **DENIED** in part.

### Background and Procedural History

Plaintiff Janice McCall is an airline pilot employed by Defendant Southwest Airlines ("Southwest") at the rank of First Officer. McCall is a member of Defendant Southwest Airlines Pilots' Association ("SWAPA"), a union that is the certified collective bargaining representative for all Southwest pilots.

On December 5, 2007, McCall was paired with Captain Jim Austin to pilot Flight 3839 from Philadelphia to Nashville. Following normal operating procedures prior to departure, Captain Austin and First Officer McCall conducted independent exterior inspections of the

aircraft and concluded that there was no need to deice the plane prior to takeoff.[1]  Takeoff, flight, and landing were uneventful, and the plane landed in Nashville as scheduled.  Upon landing, the deadheading crew informed Captain Austin of ice and snow accumulation on the wings of the plane.  McCall was not a party to this conversation.

When McCall was made aware of the incident, she filed a report under an internal safety reporting program that protects self-reporting pilots from punitive disciplinary action.[2]  The team reviewing the report unanimously determined that McCall should be returned to work with retraining, and her case was officially closed.  However, Captain Austin's report, filed just 26 minutes after McCall's, was rejected from the protective program as untimely.  Austin protested the disparity in treatment, attributing his rejection from the program to his history of hostile relations with Southwest and SWAPA.  In a move that McCall alleges was motivated by Southwest's desire to fire Austin without appearing discriminatory, McCall was retroactively expelled from the protective program.[3]  On January 21, 2008, Southwest terminated McCall, citing her failure to properly inspect Flight 3839 for ice.  Austin and McCall were the first Southwest pilots to be terminated for failure to deice.[4]

Over McCall's objection, SWAPA accepted a settlement with Southwest pursuant to which McCall was reinstated and her termination reduced to a 30-day suspension without pay.[5]  McCall complained of SWAPA's action in approving the settlement, but did not expressly

---

[1] Deicing is a procedure used to clear aircraft wings of accumulated snow and ice and to protect the aircraft during flight.  The deicer sprays fluid on the aircraft's wings, and this fluid keeps snow and ice from adhering to the wings during takeoff and flight.
[2] The Memorandum of Understanding of the Southwest Airlines Aviation Safety Action Partnership (ASAP) expressly protects pilots against company punitive disciplinary action arising out of a safety-related incident that the pilot self-disclosed to the program in the form of an ASAP report.  *See* McCall's Complaint at 11.
[3] *See* McCall's Complaint at 14.
[4] *See id.* at 8.
[5] *See id.* at 5.

request presentation to the Southwest Airlines Pilots' Board of Adjustment.[6]

On November 7, 2008, McCall filed suit against SWAPA and SWA for breach of the duty of fair representation, breach of the collective bargaining agreement, retaliatory discharge, and defamation. On July 15, 2009, SWAPA moved to dismiss the claims against it, asserting that this Court lacks subject matter jurisdiction because McCall has failed to exhaust the internal union remedies available to her, and that McCall has failed to state a claim upon which relief can be granted.

**Analysis**

I.   12(b)(1) Motion to Dismiss

   A.   Legal standard

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a claim is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim.[7] Normally, the court determines subject matter jurisdiction from the sufficiency of the allegations in the complaint, because they are presumed to be true.[8] But if a defendant makes a factual attack on subject matter jurisdiction by providing evidentiary materials challenging the jurisdiction of the court, as SWAPA has done, the court is free to weigh evidence from both sides in resolving disputed factual issues.[9] The plaintiff then

---

[6] The Railway Labor Act, 45 U.S.C. § 151 *et seq.*, mandates the establishment of a board of adjustment, which functions as an arbitrator over minor disputes arising under a collective bargaining agreement that could not be successfully resolved through internal procedures. *See* 45 U.S.C. § 184 (2006) ("It shall be the duty of every carrier and of its employees, acting through their representatives . . . to establish a board of adjustment . . . ."); *see generally Int'l Assoc. of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 685-89 (1963) (discussing history of requirement that air carriers and their employees establish boards of adjustment to resolve disputes arising out of existing contracts).
[7] *See Home Builders Ass'n, v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation and internal quotation marks omitted).
[8] *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).
[9] *See MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (citations omitted).

bears the burden of proving jurisdiction by a preponderance of the evidence.[10]

      B.      Discussion

Before an employee may bring suit against an employer for breach of a collective bargaining agreement, the employee is generally required to exhaust any grievance or arbitration remedies provided in that agreement.[11] But when the union representing the employee vis-à-vis the employer in any grievance or arbitration procedure "acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation," the employee may bring suit against both the employer and the union in federal court without having first exhausted the grievance and arbitration remedies under the collective bargaining agreement.[12] Such a lawsuit is called a "hybrid" action.

While the hybrid action allows an employee to bring suit without having exhausted her remedies under the collective bargaining agreement, the employee generally has a separate remaining duty to exhaust all internal union grievance procedures.[13] Courts have discretion to decide whether to require exhaustion of internal union remedies before suit is brought.[14] In *Clayton v. International Union*,[15] the Supreme Court identified at least three factors relevant to this determination: "first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks . . . and third, whether exhaustion of internal procedures would unreasonably delay the

---

[10] *See Paterson*, 644 F.2d at 523.
[11] *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 163 (1983) (citations omitted).
[12] *See id.* at 164 (citations omitted).
[13] *See Hayes v. Bhd. of Ry. & Airline Clerks/Allied Servs. Div.*, 727 F.2d 1383, 1385 (5th Cir. 1984) (citation omitted).
[14] *See Clayton v. Int'l Union, UAW*, 451 U.S. 679, 689 (1981); *Hayes*, 727 F.2d 1383, 1385-87 (extending the same requirement to an action under the Railway Labor Act).
[15] 451 U.S. 679 (1981).

employee's opportunity to obtain a judicial hearing on the merits of his claim."[16] If the court finds that any of these factors exist, it may properly excuse the employee's failure to exhaust internal union remedies.

SWAPA argues that McCall has failed to allege facts showing that she should properly be excused from exhausting internal remedies, and that she did not, in fact, exhaust those remedies.[17] McCall contends that she "did not need to pursue any further intra-union procedures because those procedures were not grievance related."[18] She further argues that even if there were appeals procedures that she could have pursued, such a pursuit would have been futile.[19]

In *Clayton*, the defendant union required every union member "who feels aggrieved by any action, decision, or penalty imposed upon him by the union to exhaust internal union appeals procedures before seeking redress from a civil court or government agency."[20] These procedures were established by two articles in the union's constitution and incorporated into its bylaws.[21] Furthermore, the procedures specified the proper progression in which to seek relief if the result obtained at any stage was not satisfactory.[22]

Likewise, in *Hayes v. Brotherhood of Railway & Airline Clerks*, the defendant union set forth an internal procedure in its "Protective Laws" whereby an aggrieved union member could appeal a union officer's decision.[23]

In contrast, Article XIII of the SWAPA Constitution and Bylaws, cited by SWAPA in support of its argument, does not provide specific grievance procedures for the type of complaint McCall asserts. Section 1, entitled "Hearings," reads, in full:

---

[16] *Id.* at 689.
[17] *See* SWAPA's Motion to Dismiss at 7, 9.
[18] *See* McCall's Response at 2.
[19] *See id.* at 7.
[20] *Clayton*, 451 U.S. at 682-83 (citing UAW Constitution Art. 33 § 12) (internal quotation marks omitted).
[21] *See id.*
[22] *See id.*
[23] *See Hayes*, 727 F.2d at 1385.

    A. Any active member or group of members in good standing has the right to a hearing in person before the Board of Directors.

    B. To address the Board of Directors, an active member in good standing must notify the Secretary/Treasurer in writing at least five days prior to the next scheduled meeting.

    C. Items requiring a vote of the Board of Directors shall require a sponsor from the Board of Directors to make a formal motion.[24]

This section does not pertain to grievance procedures on its face, nor does it provide any information about what topics are appropriate for a Board hearing. There is no direction as to what information must be contained in the requisite notice to the Secretary/Treasurer. There is no guidance as to what items require a vote of the Board, nor information on how to obtain a sponsor from the Board if one is necessary. As for items that do not require a vote, no notice is given as to what the available remedies might be.

Section 2, dealing with petitions through the union membership, is equally vague as to its relevance to an internal grievance process. Subsection B(3) simply states that "[i]ssues are to be limited to those which are consistent with the objects of the Association."[25] Although the procedures related to submitting a petition are more detailed than those for obtaining a Board hearing, it is not obvious—and the document nowhere states—that a membership petition, possibly resulting in a referendum and vote by the entire union membership, is a mechanism meant for the resolution or appeal of individual grievances.

SWAPA has failed to point to any provisions in the SWAPA Constitution and Bylaws that provide a clear procedure whereby McCall's grievance concerning an alleged breach of the duty of fair representation could be heard and adequately remedied through an internal union process. While it is difficult for a plaintiff to satisfy the burden of affirmatively showing that such a provision does *not* exist, the preponderance of the evidence shows that there are no further

---

[24] *See* SWAPA's Motion to Dismiss, app. at 16.
[25] *See id.* at 17.

internal union remedies to exhaust.[26] The Court therefore does not reach the question of whether McCall had any proper excuses for failure to exhaust.

II.  12(b)(6) Motion to Dismiss

    A.  Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*[27] and reaffirmed in *Ashcroft v. Iqbal*,[28] the pleading standard Rule 8 announces does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support.[29] While a court must accept all of the plaintiff's allegations as true, it is not bound to accept as true "a legal conclusion couched as a factual allegation."[30] A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not do.[31] To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.[32] A claim has facial plausibility when the court can draw a reasonable inference from the pleadings that the defendant is liable for the misconduct alleged.[33] Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped

---

[26] *See Hammons v. Adams*, 783 F.2d 597, 602 (5th Cir. 1986) ("If, however, the union's constitution does not provide a procedure whereby [the employee's] grievance concerning breach of a local union's duty of fair representation may be heard and adequately remedied, there is nothing to exhaust."); *see also Guidry v. Int'l Union of Operating Eng'rs, Local 406*, 882 F.2d 929, 941 (5th Cir. 1989) ("The Union Constitution and bylaws . . . provide simply that the local union's determination of any grievance shall be final and binding. Neither provides specific grievance procedures for the type of complaint [the employee] asserts. In such absence of procedural requirements, an employee may proceed to file suit after pursuing his contractual remedies.").
[27] 550 U.S. 544 (2007).
[28] 129 S. Ct. 1937 (2009).
[29] *Id.* at 1949 (citations omitted).
[30] *Id.* at 1949-50 (quoting *Twombly*, 550 U.S. at 555).
[31] *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).
[32] *Id.* at 570.
[33] *See Twombly*, 550 U.S. at 556.

short of showing that the pleader is plausibly entitled to relief.[34]

      B.      Breach of the Duty of Fair Representation

In Count I of her Complaint, McCall alleges that SWAPA breached its duty of fair representation in connection with McCall's dispute with Southwest.  SWAPA argues that its representation was in fact excellent and effective, and that its decision not to further arbitrate McCall's case was within its discretion and not contrary to the principles of fair representation.

The Supreme Court has found a statutory duty of fair representation in the Railway Labor Act.[35]  This duty arises out of the relationship between a union and members of a collective bargaining unit, and requires SWAPA, as the exclusive bargaining agent for all Southwest pilots, to represent fairly all of those employees subject to a collective bargaining agreement with Southwest.[36]  A union violates its duty of fair representation only if its conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.[37]   Each of these standards represents a distinct and separate inquiry.[38]

Under the "arbitrary" prong, a union's actions breach the duty of fair representation "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational."[39]  The Fifth Circuit has conceded that the arbitrariness standard is difficult to define, but stated that, to be non-arbitrary, a decision must be: "(1) based upon relevant, permissible union factors which excludes

---

[34] Fed. Rule Civ. P. 8(a)(2); *Iqbal*, 129 S. Ct. at 1950.
[35] *See Vaca v. Sipes*, 386 U.S. 171, 177 (citing *Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944); *Tunstall v. B'hd of Locomotive Firemen*, 323 U.S. 210 (1994)).
[36] *Id.* (citing *Humphrey v. Moore*, 375 U.S. 335, 342 (1964)); *Richardson v. United Steel Workers of Am.,* 864 F.2d 1162, 1166 (5th Cir. 1989).
[37] *Vaca*, 386 U.S. at 190 (citations omitted); *see Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991).
[38] *See Griffin v. Int'l Union, United Automobile A & AIW*, 469 F.2d 181, 183 (4th Cir. 1972) ("A union must conform its behavior to each of these three separate standards. . . .  Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.").
[39] *O'Neill*, 499 U.S. at 67 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)) (internal quotation marks omitted); *see Marquez v. Screen Actors Guild*, 525 U.S. 33, 46 (1998) ("A union's conduct can be classified as arbitrary only when it is irrational . . . without a rational basis or explanation.").

the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of a fair and impartial consideration of the interests of all employees."[40]

A union must also treat its members similarly.[41] The kind of discriminatory action proscribed by the second prong of the tripartite test is discriminatory action that is "invidious."[42] As to the third prong, the Fifth Circuit has described the "demanding standard" of demonstrating bad faith as conduct that is "sufficiently egregious" or so "intentionally misleading" as to be "invidious," or as to evince a purpose to intentionally harm the membership.[43] Bad faith conduct has also been described by the Fifth Circuit as "the absence of honest purpose and judgment or the presence of hostility or discrimination" by the union.[44]

A union does not breach the duty of fair representation through simple negligence or a mistake in judgment; the critical question is whether a union's conduct was arbitrary, discriminatory, or in bad faith, such that it undermined the fairness or integrity of the grievance process.[45] In the interest of effectively administering the machinery of grievance arbitration, a union is allowed a wide range of discretion in screening out, settling, or abandoning grievances before arbitration if it believes in good faith that the particular grievance does not justify proceeding through the "costly and time-consuming final step" of arbitration.[46] An employee "has no absolute right to have his grievance taken to arbitration, or to any other level of the

---

[40] *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 957 (5th Cir. 1976).
[41] *See Vaca*, 386 U.S. at 191 (labor laws are designed to ensure that "similar complaints will be treated consistently").
[42] *See O'Neill*, 499 U.S. at 81.
[43] *See O'Neill v. Air Line Pilots Ass'n, Int'l*, 939 F.2d 1199, 1203, 1204 (5th Cir. 1991).
[44] *Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1128 n.9 (5th Cir. 1980).
[45] *Landry v. The Cooper/T. Smith Stevedoring Co.*, 880 F.2d 846, 852 (5th Cir. 1989) (internal citations and quotation marks omitted).
[46] *Local 575, Packinghouse Division, Amalgamated Meat Cutters and Butcher Workmen (UPWA), AFL-CIO (Omaha Packing Company)*, 206 N.L.R.B. 576, 579 (1973) (citing *Vaca*, 386 U.S. at 190-91); *see Vaca*, 386 U.S. at 192 (concluding that "a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration").

grievance process."[47]

SWAPA's duty of fair representation is associated with the grievance process that began after McCall was terminated by Southwest. McCall makes several allegations regarding arbitrary, discriminatory, or bad faith actions taken by SWAPA in the investigatory period preceding her termination, but these alleged acts cannot form the basis for her claim for a breach of the duty of fair representation. Nor, as explained below, do claims for retaliatory termination and defamation lie where SWAPA is neither McCall's employer nor the employer of the individuals who allegedly made the defamatory statements.

The remaining relevant allegations for consideration are that SWAPA: (1) attempted to coerce McCall into materially altering her account of the Flight 3839 deicing incident by brokering back-door deals after her termination; (2) refused to give McCall information relevant to her defense, and to which she had a right to access, after she had requested this information in good faith; (3) denied McCall "meaningful grievance process participation at every turn" in connection with her formal dispute with Southwest; (4) appointed an ethically conflicted lawyer to represent her before the FAA and then summarily denied her repeated objections and requests for fair representation; (5) refused to submit her grievance to the Southwest Pilots' Systems Board of Adjustment; and (6) accepted a grievance settlement offer on her behalf "despite her vehement protests." [48]

McCall has sufficiently stated a claim for breach of the duty of fair representation. Although McCall does not neatly distinguish between the three categories of arbitrary, discriminatory, and bad faith breaches in her Complaint, the facts she alleges are relevant to support an argument under any of these three theories, which by nature overlap to a certain

---

[47] *Landry*, 880 F.2d at 852 (citing *Turner v. Air Transport Dispatchers Assoc.*, 468 F.2d 297, 299 (5th Cir. 1972)).
[48] *See* McCall's Complaint at 24-25, 43-45.

Page **10** of **17**

degree. But because McCall only advances the theories of arbitrary and discriminatory conduct in her Complaint, without arguing bad faith, the Court only considers those two tests.

The crux of McCall's claim is that SWAPA refused to take her grievance before the Systems Board of Adjustment, instead unilaterally accepting a grievance settlement on her behalf "despite her vehement protests."[49] McCall further alleges that SWAPA accepted the settlement without discussing the terms and conditions of the settlement with her, and without providing her with access to counsel.[50]

SWAPA argues that it had no duty to proceed before the Systems Board.[51] While the refusal to press a grievance case to this stage may not, in and of itself, precipitate a claim for a breach of the duty of fair representation, the factual landscape described in McCall's Complaint raises a plausible inference that this particular action was arbitrary or irrational. McCall alleges that SWAPA engaged in the following actions: expelling McCall from the protective program after her initial acceptance, conducting what McCall alleges was a "farce" of an investigation with the sole goal of setting forth justifiable grounds for her expulsion;[52] leaking federally protected narratives provided by McCall and others onto the company webpage;[53] repeatedly refusing her multiple requests for data to help identify other instances in which pilots were rejected or expelled from the protective program;[54] classifying the deicing incident as an "administrative" rather than a "safety" issue to deny McCall her right of access to a mediated debrief program;[55] convincing McCall to write, and assisting her in writing, a formal apology

---

[49] *Id.* at 44.
[50] *See id.* at 39.
[51] *See* SWAPA's Motion to Dismiss at 13-14; SWAPA's Reply at 8 (citing *Hammons v. Adams*, 783 F.2d 597, 601 (5th Cir. 1986) ("[F]air representation does not require a union to carry every grievance to arbitration, for the union is given substantial discretion to decide whether and how far a grievance should be pursued.") (citation omitted)).
[52] *See* McCall's Complaint at 19.
[53] *See id.* at 22.
[54] *See id.* at 24-25.
[55] *See id.* at 26-27.

and admission of guilt to Southwest despite McCall's insistence upon her innocence, which letter was promptly cited by Southwest in support of her termination;[56] attempting to coerce McCall into materially altering her account of the Flight 3839 deicing incident because of a pending U.S. Department of Labor whistleblower complaint filed by Captain Austin;[57] failing to adequately investigate her grievance;[58] and appointing an ethically conflicted lawyer to represent her before the FAA and then summarily denying her repeated objections and requests for fair representation.[59]  Such facts, considered together and taken as true, create a plausible inference that either or both SWAPA's refusal to present McCall's case to the Board and its acceptance of the settlement agreement was arbitrary or irrational.

      SWAPA also implies that McCall was not in fact opposed to the settlement agreement, pointing out that McCall failed to allege that she offered to give up the benefits of her settlement so that her grievance could go forward to the Systems Board of Adjustment.[60]  But in considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true the facts pled in McCall's Complaint.  McCall asserts several times in her Complaint that she was strongly opposed to the settlement agreement.  Even if McCall never offered to give up the benefits of her settlement, that fact would not establish conclusively that she was not opposed to the settlement agreement.

      In addition to the history recited above, McCall alleges the following additional facts to support a claim that SWAPA's behavior was discriminatory: (1) that Captain Austin was unpopular among SWAPA officials because of, *inter alia*, his previous and public participation

---

[56] *See id.* at 29-31.
[57] *See id.* at 31-34.
[58] *See id.* at 40-42.
[59] *See id.* at 44.
[60] *See* SWAPA's Motion to Dismiss at 12.

in a financial audit of SWAPA resulting in the removal of senior SWAPA officials;[61] (2) that SWAPA collaborated with Southwest to have McCall retroactively removed from the protective reporting program so that it could terminate Austin;[62] and (3) that such cooperation failed to protect McCall's rights as a union member and resulted in treatment that was markedly different from the way other union members had been treated in the past, exemplified in McCall's acceptance and then rejection from the protective reporting program.[63]  While these facts cannot form the basis of a claim for breach of the duty of fair representation, having occurred before the termination grievance, they raise a plausible inference that SWAPA's actions during the grievance process were discriminatory.

SWAPA's argument that McCall fails to meet "the high standard of proof required in a DFR [duty of fair representation] case"[64] is inapposite in a Motion to Dismiss because McCall only needs to state a claim to relief that is plausible on its face.[65]  The facts pled by McCall, taken as true, cumulatively create a plausible inference that SWAPA breached its duty of fair representation by acting in both an arbitrary and a discriminatory manner.  SWAPA's Motion to Dismiss this count is therefore DENIED.

    C.    Choice of Law

As a federal court sitting in diversity, this Court applies the choice of law rules of the forum state.[66]  Texas follows the "most significant relationship" approach in choice of law

---

[61] *See* McCall's Complaint at 8.
[62] *See id.* at 14.
[63] *See id.* at 14, 17.
[64] SWAPA's Motion to Dismiss at 12.
[65] *See Brady v. Allied Pilots Ass'n*, 2003 U.S. Dist. LEXIS 22875, at *5 n.2 (N.D. Tex. Dec. 15, 2003) (Fitzwater, J.) (noting, in the context of a claim that a pilot's union breached its duty of fair representation by denying a System Board of Adjustment hearing to resolve the pilots' grievance, that "Rule 12(b)(6) dismissal would likely be improper" although the motion for summary judgment would be granted).
[66] *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Cantu v. Jackson Nat'l Life Ins. Co.*, 2009 U.S. App. LEXIS 18049, at *5 (5th Cir. Aug. 12, 1998) (citing *Caton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990)).

analyses.[67] Applying this approach, McCall urges that Illinois law governs the present action, while SWAPA argues that Texas law should apply.

The parties agree that the proper choice of law analysis is conducted under the principles and factors set out in the Restatement (Second) of Conflict of Laws §§ 6 and 145. The principles stated in § 6 apply to all choice of law rules, while § 145 specifically governs cases sounding in tort.[68] Under § 6, the court must evaluate such factors as the relative interests of the states involved in the determination of the particular issue, the relevant policies of the forum and other interested states, the protection of justified expectations, and the certainty, predictability and uniformity of results. Under § 145, contacts to be taken into account in applying these principles include: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.[69]

The Court finds that Texas is the state with the most significant relationships in this case. McCall's various in-person and telephone interviews in Chicago, Illinois do not compel a different conclusion. Indeed, in arguing that venue is proper in this district, McCall stated in her Complaint that "a substantial part of the acts giving rise to this action took place in Dallas."[70] Illinois has no substantial interest in having its law apply, because no interests of Illinois residents or businesses are involved. Texas, on the other hand, has a strong interest in having its employment laws apply to Texas corporations. Southwest is a Texas corporation. SWAPA is headquartered in Dallas, Texas, where it conducts extensive operations. McCall is neither a

---

[67] *See Hughes Woods Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (citing *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979)).
[68] *See id.*
[69] Restatement (Second) of Conflicts § 145.
[70] *See* McCall's Complaint at 3.

resident of Texas nor Illinois.

Applying the principles and factors set out in the Restatement (Second) of Conflict of Laws §§ 6 and 145, the Court finds that Texas law governs the present action.

D.  Retaliatory Discharge

McCall raises a claim for retaliatory discharge in Count III of her Complaint. The employer is the proper defendant in a retaliatory discharge claim.[71] SWAPA is not McCall's employer and did not discharge her, and is therefore not a proper party to McCall's retaliatory discharge claim. Furthermore, McCall's retaliatory discharge claim is premised on Illinois law, which does not apply in this case. McCall's claim against SWAPA for retaliatory discharge is therefore dismissed.

E.  Defamation

Finally, McCall alleges that SWAPA and Southwest are vicariously liable for defamation based on the publishing of various statements regarding McCall's case via email, speech, and print to third parties. Under Texas law, an employer may be held vicariously liable for defamatory comments made by an employee in the scope of his or her employment.[72] An action for vicarious liability lies where the defamation "is referable to the duty owing by the agent to the corporation, and was made while in the discharge of that duty."[73]

---

[71] *Chatman v. Saks Fifth Ave., Inc.*, 762 F. Supp. 152, 155 (S.D. Tex. 1991); *see Genella v. Renaissance Media*, 115 F. App'x 650, 651 fn.1 (5th Cir. 2004) (holding that a named defendant was not a proper party to an action for retaliatory discharge because the evidence was undisputed that the defendant was not the plaintiff's employer); *Williams v. AT&T, Inc.*, 2009 U.S. Dist. LEXIS 28856, at *2 (S.D. Tex. Apr. 6, 2009) (discussing earlier grant of AT&T's motion for summary judgment in the retaliatory discharge case on the basis that it was not a proper party because the plaintiff's employer was in fact Southwestern Bell); *EEOC v. Omni Hotels Mgmt. Corp.*, 516 F. Supp. 2d 678, 685 (N.D. Tex. 2007) (Stickney, M.J.) (holding that plaintiff's employer was the only proper defendant in a retaliatory discharge case).

[72] *See Carlton v. Steele*, 278 F. App'x 352, 353 (5th Cir. 2008) (citation omitted); *Grogan v. Savings of Am., Inc.*, 118 F. Supp. 2d 741, 750 (S.D. Tex. 1999) (citation omitted); *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002).

[73] *Minyard*, 80 S.W.3d at 577 (discussing the Texas Supreme Court's adoption of this rule in 1968) (citations omitted). *See Anderson v. City of Dallas*, 2005 Tex. App. LEXIS 5115, at *17 (Tex. App.—Dallas, July 1, 2005, n.w.h.) ("An employer may also be liable for defamatory comments made by an employee in the scope of his or her

McCall's defamation claim is based on the allegedly defamatory statements of two individuals, Tom Dean and Steve Swauger. She argues that the statements made by Dean and Swauger "are imputed to . . . SWAPA."[74] McCall refers to Swauger as a "Southwest Captain" in her Complaint, but nowhere alleges that Swauger is employed by SWAPA.[75] Thus, Swauger's statements cannot form the basis of a complaint against SWAPA.

As for Tom Dean, McCall's complaint alleges that he is "the LAS SWAPA Domicile Representative," and performs work for SWAPA in that capacity.[76] McCall further clarifies in her Response that, pursuant to the SWAPA Constitution and Bylaws, domicile representatives are members of the SWAPA Board of Directors.[77]

According to the SWAPA Constitution, domicile representatives are active SWAPA members in good standing who stand for election as representatives of their fellow members in various geographic districts.[78] Domicile representatives serve as the normal contact between domicile members and the Executive Officers of SWAPA, and as intermediaries between domicile members and local Southwest management.[79] However, popular election to a representative position within SWAPA is not the same thing as employment with SWAPA, nor does a position on the Board of Directors of an organization equate to employment with that organization. McCall's complaint fails to allege that Tom Dean is an employee of SWAPA. Without alleging this fact, Dean's statements cannot form the basis of a complaint against

---

employment.") (citing *Minyard*, 80 S.W.3d at 577 (Tex. 2002)); *Cotton Belt R.R. v. Hendricks*, 768 S.W.2d 865, 870) (Tex. App.—Texarkana 1989, no writ) (to prevail on a defamation claim against a corporate employer, the plaintiff must show that the defamatory publication was made by an employee in the course and scope of the declarant's employment).

[74] *See* McCall's Complaint at 53.
[75] *See id.* at 52.
[76] *See id*. The Complaint never makes clear what the acronym "LAS" stands for, nor is this explained in any subsequent briefing.
[77] *See* McCall's Response at 15.
[78] *See* McCall's Response, Ex.2 at 8-10, 13 (SWAPA Constitution and Bylaws).
[79] *See id.* at 13.

SWAPA.  McCall's claim for defamation against SWAPA is therefore dismissed.

## Conclusion

For the reasons stated above, the Motion to Dismiss under Rule 12(b)(1) is **DENIED**. The Motion to Dismiss under Rule 12(b)(6) is **GRANTED** as to McCall's claims for retaliatory discharge and defamation and **DENIED** as to McCall's claim for breach of the duty of fair representation.

**SO ORDERED.**

October 1, 2009.

*[signature]*
**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**